GROSS, J.
Jesus Quevedo appeals a final order of the South Florida Water Management District (“District”) revoking a right-of-way occupancy permit authorizing Quevedo to erect and maintain a fence on his property which restricted public access to a portion of the District’s right-of-way along a canal behind Quevedo’s home. Finding substantial competent evidence to support the permit revocation, we affirm.
On May 13, 1998, the District served an Administrative Complaint, Order, and Notice of Intent to Revoke Permit Modification upon Quevedo, who disputed the allegations of fact and requested a formal hearing. On July 15, 1998, the matter was referred to the Division of Administrative Hearings.
Following an administrative hearing, Administrative -Law Judge Errol Powell made the findings of fact contained in this opinion.
As local sponsor for a United States Army Corps of Engineers’ flood control project, the District acquired canal rights-of-way. The rights-of-way “were acquired to enable the Corps of Engineers to construct .the flood control project and to maintain the system after its construction.” The judge also found:
3. The District operates a proprietary-based right-of-way program to manage the various property interests of the canal rights-of-way. The purpose of the District’s right-of-way program is, to the extent possible, to allow uses of the rights-of-way that do not conflict with the flood control project. The rights-of[-]way are used by both public and private concerns, including adjacent property owners, governmental entities, and utility companies.
4. Jesus G. Quevedo is a private individual. ... [Quevedo’s property] was vacant when Mr. Quevedo purchased it, and he has owned the property for approximately ten (10) years.
5. The District has fee simple title to a strip of land on the south side of the District’s C-51 Canal, immediately west of the Federal Highway/Olive Avenue bridge (C-51 RighNof-Way). Mr. Quevedo’s property is located at the side of and adjacent to the C-51 Right-of-Way.
6. The C-51 Right-of-Way is also located within the boundaries of Spillway Park as established in the agreement between the District and the City of Lake Worth. Generally described, Spillway Park includes the District’s fee simple owned right-of-way on the south side of the District’s C-51 Canal, beginning at the west side of the Federal Highway/Olive Avenue bridge and continuing *984 to the east side of the Dixie Highway bridge.
7. Mr. Quevedo has no real property interest-in the C-51 Right-of-Way.
8. Prior to purchasing his property, Mr. Quevedo was aware that the District owned the C-51 RighNof-Way.
9. Historically, portions of Spillway Park and the C-51 RighNof-Way; in particular, have been a unique and popular location for excellent snook[1] fishing by the public. These areas continue to be considered as such.
(Footnote supplied).
On February 11, 1993, the District issued Quevedo a permit which authorized him to build a boat dock, install pop-up sprinklers, and sod the right-of-way. Pri- or to the issuance of the permit, Quevedo had discussed the erection of a cross-fence with the District “based on allegations of improper or criminal activities by members of the public.”
Later, in November, 1995, Quevedo again approached the District about the erection of a croSs-fence based on the 1993 claim of the public’s criminal conduct plus a new allegation regarding public safety near the C-51 seawall. “Based on the concern for public safety, the District’s staff recommended that Mr. Quevedo be granted a modification to the Permit for a cross-fence.”[2]
On November 14, 1996, the District approved and issued Permit MOD No. 9801 (“MOD permit”) authorizing Quevedo to install a chain link fence with a sixteen-foot vehicular gate along the west property line within the south right-of-way of the C-51 canal. Just like the original permit, the MOD permit provided in part:
The permittee, by acceptance of this permit, hereby agrees that he shall promptly comply with all orders of the District and shall alter, repair or remove his use solely at his expense in a timely fashion....
This permit is issued by the District as a license to use or occupy District works or lands ... [.] By acceptance of this permit, the permittee expressly acknowledges that the permittee bears all risk of loss as a result of revocation of this permit.
Both the original and MOD permits “contained standard limiting conditions, as provided in Rule 40E-6.381, Florida Administrative Code, and special conditions.” The limiting conditions provided in pertinent part:
(2) Permittee agrees to abide by all of the terms and conditions of this permit, including any representations made on *985 the permit application and related documents ....
(3) This •permit does not create any vested rights, and except for governmental entities and public or private utilities, is revocable at mil upon reasonable pri- or written notice. Permittee bears all risk of loss as to monies expended in furtherance of the permitted use. Upon revocation, the permittee shall promptly modify, relocate or remove the permitted use. In the event of failure to so comply within the specified time, the District may remove the permitted use and permittee shall be responsible for all removal costs.
(4) This permit does not convey any property rights nor any rights or privileges other than those specified herein....
(Emphasis supplied).
Having been granted the permit, Queve-do erected the fence, thus preventing public access onto the C-51 right-of-way.
Before and after the erection of the fence, Quevedo, his family, and guests fished from the C-51 seawall and used that portion of the C-51 right-of-way enclosed by the fence. Quevedo and his family “selectively controlled access by the public to the C-51 Right-of-Way at the C-51 seawall.” The administrative judge found that:
19. Prior to the erection of the cross-fence, Mr. Quevedo chased members of the public off the C-51 RighNof-Way. Mr. Quevedo and members of his family also called law enforcement officers to remove members of the public who were located on the C-51 Right-of-Way, even if the members of the public were fishing from the C-51 seawall.
20. After the erection of the cross-fence, Mr. Quevedo and his family members continued to engage in this conduct of selective access.
After the fence was erected, Quevedo had a member of the public, Rett Thompson, arrested for'trespassing. Thompson allegedly jumped or went around the fence to fish from the C-51 seawall in the C-51 right-of-way. After installing the fence, Quevedo
prevented the general public from using the C-51 RighNof-Way, including the C-51 seawall. As a result, he has acquired the exclusive, private use of the C-51 Right-of-Way at the C-51 seawall, which is publically owned land, and has, almost doubled the size of his adjacent property without the obligations and expense of acquisition
The District’s . policy was that “public land should be open to the public.” Quev-edo’s fence ran contrary to this policy by hindering access to the right-of-way, including the seawall, for passive recreational uses. Similar cross-fencing exists behind residences on the northeast, northwest, and southeast sides of Federal Highway along the C-51 canal bank. This fencing also “prevents, public use of the District’s C-51 Canal bank at these locations.”
The District revisited the “original public safety rationale” for authorizing Queve-do to erect the cross-fence blocking public access. “Additional investigation by safety experts (Risk Management staff) revealed that no unreasonable danger existed by allowing public access to the C-51 seawall at the C-51 Right-of-Way.” Thus, without a public safety reason to close the right-of-way, “such closure was contrary to District policy. As a consequence! the District’s staff recommended to the District’s Governing Board that the MOD Permit” authorizing Quevedo’s cross-fence be revoked.
The District held two public meetings on the revocation of the permit. Quevedo, members of the public, and the District’s staff commented on the matter. Then, the District’s Governing Board determined that the C-51 right-of-way should be open to the public. Consequently, the District revoked Quevedo’s MOD permit. The District’s final order adopted the findings of fact and conclusions of law contained in the *986 administrative judge’s recommended order.
In the recommended order adopted by the District, Judge Powell drew a number of conclusions of law. Part I of Chapter 373, Florida Statutes (1999), authorizes the District to provide for works to accomplish the “purposes and policies” set forth in Chapter 373. In section. 373.016(3)(i), Florida Statutes (1999), the legislature expressly stated its policy to “promote recreational development, protect public lands, and assist in maintaining the navigability of rivers and harbors.”
Sections 373.085(1) and 373.086(1), Florida. Statutes (1999), generally describe the power of the District to regulate the land under its control. Subsection 373.085(1) states that the governing board of a water management district
has authority to prescribe the manner in which local works "provided by other districts or by private persons will connect with and make use of the works or land of the district, to issue permits therefor, and to cancel the permits for noncompliance with the conditions thereof or for other cause.
Section 373.086(1) provides that
[i]n order to carry out the works for the district, and for effectuating the purposes of this chapter, the governing board is authorized ... to hold, control, and acquire by donation, lease, or purchase, or. to condemn any land, public or private, needed -for a rights-of-way or other purpose ... and to hold and have full control over the works and rights-of-way of the district.
Florida Administrative Code 40E-6.011(2) describes the limited scope of occupancy permits for lands under District control. The District retains “complete dominion” of its works and lands due to their “critical importance” in “providing flood protection and other benefits.” The administrative regulation narrowly and carefully defines a “permit.”
A “permit” to utilize works or lands of the District is a contract between the District and “permittee,” whereby the permittee obtains a license which is revocable at will, except as otherwise provided herein. All risk of loss regarding expenditures in furtherance of the permitted use is borne by the permittee. The District retains complete discretion as to the manner, if any;' in which District works or lands may be utilized, and nothing is these rules is intended to limit that discretion.
[[Image here]]
(4) The term “permit” or “occupancy permit” when used in these rules are intended to mean a contractual license to occupy the works or lands of the District.
Fla. Admin. Code r. 40E-6.011(2) & (4).
Florida Administrative Code Rule 40E-6.301 concerns the issuance of permits. It states in part:
(1) In determining whether an occupancy permit should be issued, the District shall consider whether the proposed activity:
[[Image here]]
(b) is consistent with the policy and objectives of Chapter S7S, F.S., the legislative declaration of policy contained in Section S7S.016 F.S. ...
[[Image here]]
(j) interferes with actual or potential public use of the District’s works or public recreational or other facilities not within the District’s works....
(Emphasis supplied). Rule 40E-6.381 contains the “standard limiting conditions” which are required to be included within all permits issued by the District under Chapter 40E of the code and states in part:
The District’s authorization to utilize lands and other works constitutes a revocable license. In consideration for receipt of that license, permittees shall agree to be bound by the following standard limiting conditions, which shall be *987 included within all permits issued pursuant to this chapter.
[[Image here]]
(3) This permit does not create any-vested rights, and except for governmental entities and public or private utilities, is revocable at will upon reasonable prior written notice. Permittee bears all risk of loss as to monies expended in furtherance of the permitted use. Upon revocation, the permittee shall promptly modify, relocate or remove the permitted use. In the event of failure to so comply within the specified time, the District may remove the permitted use and permittee shall be responsible for all removal costs.
(4) This permit does not convey any property rights nor any rights or privileges other than those specified herein....
Florida Administrative Code Rule 40E-6.341 deals with the revocation of permits and provides in pertinent part:
(1) [T]he District is authorized to revoke an occupancy permit under any of thefollmuing circumstances:
[[Image here]]
(d) the permitted use is inconsistent with the factors and conditions enumerated in section j.OE-6.301, F.A.C.
(Emphasis supplied). Also involving permit revocation, Florida Administrative Code Rule 40E-1.609 provides in pertinent part:
(2) The District may revoke a permit or modify its terms and conditions when it determines that such action is necessary to protect the public health, safety and welfare, prevent a public or private nuisance, or when the continued utilization of the permit becomes inconsistent with the objectives of the District. In such instances,'due consideration shall be given to the extent to which the permittee has detrimentally relied upon the permit.
(Emphasis supplied).
The administrative judge concluded that the District had demonstrated that the revocation of the permit was warranted and that the conditions of revocation had been met. The judge ruled that the fence’s prevention .of “the promotion of recreational development” was “inconsistent with the legislative declaration of policy” in section 373.016, Florida Statutes (1999); the fence’s interference with the “actual and potential use” of the public land was inconsistent with Rule 40E-6.301(l)(j). The judge found that the
District demonstrated that Mr. Queve-do’s present use and occupancy of the District’s right-of-way (District’s C-51 Right-of-Way) precludes all public access and use of the portion of the District’s right-of[-}way located within Spillway Park and adjacent to Mr. Quevedo’s home; that that portion of the District’s right-of-way has been historically and continues to be a unique and popular location for excellent snook fishing, which has been and should continue to be enjoyed by the public[.]
The judge found “no unreasonable safety risk” existed by allowing public access to the portion of the right-of-way blocked by Quevedo’s fence. The judge rejected Quevedo’s claim of detrimental reliance under Rule 40E-1.609(2), finding that Quevedo
was aware, before erecting the cross-fence and making any improvements on the permitted property and the C-51 RighNof-Way, that any such improvements would be at his own expense. Moreover, Mr. Quevedo’s conduct shows that he considered the Permit and the MOD permit not as a license granted by the District to use the District’s right-of-way, but the granting to him of a proprietary right in the right-of-way, giving him additional private property, which allowed the use of the right-of-way, not by the general public, but by only those who he or his family chose.
Perdue v. TJ Palm Associates, Ltd., 755 So.2d 660 (Fla. 4th DCA 1999), sets forth the parameters for our review of *988 the District’s revocation of the permit. This court is “prohibited from substituting [its] judgment for that of the agency in assessing the weight of the evidence resolving disputed factual issues.” Id. at 666; see § 120.68(10), Fla. Stat. (1999). As we said in Perdue, the District’s action in this case “may be set aside only after a determination that the agency’s findings are not supported by competent substantial evidence in the record.” 765 So.2d at 668.
The concept of “competent substantial evidence” was explained in DeGroot v. Sheffield, 95 So.2d 912, 916 (Fla.1957):
Substantial evidence has been described as such evidence as wjll establish a substantial basis of fact from, which the fact at ipsue can be reasonably inferred. We have stated it to be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion.... We are of the view, however, that the evidence relied upon to sustain the ultimate finding should be sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached. To this extent the “substantial” evidence should also be “competent.”
(Citations omitted).
We reject Quevedo’s argument that the District’s revocation of the permit was arbitrary, capricious, and in departure from the essential requirements of law. Rule 40E-6.341 states that the District may revoke a permit if it is “inconsistent with the factors and conditions enumerated in section 40E-6.301.” Section 40E-6.301 requires the issuance of a permit be consistent with “the legislative declaration of policy contained in Section 373.016.” Section 373.016(3)(i) specifies the paramount legislative intent to “promote recreational development” and “protect public lands.” Rule 40E-6.301(l)(j) codifies the legislative policy of preserving public access to public lands.
In revoking the permit, the District revisited the public safety issue and concluded that public access to the seawall and the right-of-way “revealed ... no unreasonable danger.” Nothing in the applicable statutes or rules precludes the District from changing its mind to correct a mistake. The District contends, that it should never have issued the permit in the first place, since it failed to adequately consider whether the fence interfered with the “actual or potential public use” of the area at issue. Fla. Admin. Code R. 40E-6.301(l)(j). The record amply supports the District’s conclusion that the public’s right of access outweighed those concerns that would justify closure.
Quevedo points to the property with fences on the north side of the canal to argue that the disparate treatment of the fences cannot be reconciled, such that the District’s revocation of his permit must be viewed* as arbitrary and capricious. However, the record reflects that the right-of-way at issue is unique for snook fishing.
At the Governing Board’s June 12, 1997 discussion regarding the MOD permit, Rett, Thompson explained that the location blocked by Quevedo’s fence “has long been known as an excellent snook hole, probably due to the adjacent bridge and pilings.” Thompson testified during the hearing before the administrative judge that he had fished there for years and' that his young children usually fished in that area. He explained that fishing off the pier was difficult for the children, because they “have a hard time keeping their rod over the top of the wooden railing.” Thompson pointed out that snook are abundant in that area. He said that “there are certain areas that are better for catching fish than others, and that happens to be a very, very good area.” Another witness described this fishing area as “the sweet spot of the canal” for snook fishing. Yet, another witness said “this is the best snook fishing in our. area when it rains.” Finally, the location of Quevedo’s property differs from the others from the standpoint of public access; the right-of-way on the south side of the canal is located within Spillway Park, while the right-of-way behind the homes on the north side of the canal is not within South Olive Park.
*989 There was evidence that somfe fishermen misbehaved when using the right-of-way by urinating, littering, excessive partying, and making noise; there was also evidence that the majority of snook fishermen are quiet, because “[t]hey know they’re not going to catch fish if there’s a lot of noise.” The District was within its authority to conclude that cited incidents of public misbehavior did not constitute such a threat to public safety so as to justify choking off all public access to the right-of-way.
Finally, we find that the District gave “due consideration” to the “extent to which the permittee has detrimentally relied upon the permit.” Fla. Admin. Code r. 40E-1.609(2). There was abundant evidence to demonstrate that Quevedo’s “utilization” of the permit became “inconsistent with the objectives of the District.” Id. It is not proper for this court to substitute its judgment for that of the agency on this issue.
AFFIRMED.
GUNTHER and SHAHOOD, JJ., concur.

. Snook is a sport fish. As described in a recent issue of Florida Sportsman, ■
[t]he most prominent physical characteristic of this fish is the lateral line, a sharply drawn black stripe running from head to tail and earning the nickname “linesider.” Coloration ranges from bright silver with a gray-green back along the coast to gold flanks and a nearly black back far up the tannin-stained creeks of the Everglades.
Frank Sargeant, Snook, Florida Sportsman, Mar., 2000, at 31. It has been said that no other type of fish has as devout a following as snook. The lure of snook for certain fishermen is summarized by the following:
But what is it about a snook that turns normally sane fishermen into driven anglers willing to forego every aspect of their daily lives?
Possibly,, that thump. Or maybe it’s the way a snook will blast a surface plug five feet into the air, then come back and do it again on the very next twitch. Or the stop- and-go thrill of a big linesider grabbing a jig and forcing its way under a bridge, or the habit of rushing out from under a mangrove root to eat a bait, then returning back to the exact same spot before the surface detonation exposes the strike. The fact that snook are excellent on the table doesn't scare off any anglers either.
Mike Holliday, The Culture Club, Florida Sportsman, Mar., 2000, at 24-25.

. The administrative judge noted that when approval of the fence appeared on the Governing Board’s agenda, "the public safety reason was not mentioned in the agenda for the recommendation for approval. However what appeared in the agenda were the unlawful or inappropriate activities by the members of the public.”