WELLS, Judge,
dissenting from denial of Rehearing En Banc.
I would grant rehearing en banc, withdraw the panel opinion, and affirm the order of the Department of Community Affairs which adopted the recommended order of the administrative law judge (ALJ) finding the small scale amendment at issue consistent with the Miami Comprehensive Neighborhood Plan. I would do so for the following reasons.
First, the opinion improperly reweighs the evidence in direct contravention of section 120.68(7)(b) of the Florida Statutes which, as pertinent here, expressly provides that although a court may set aside agency action when it finds that “agency action depends on any finding of fact that is not supported by competent, substantial evidence in the record,” the court may not “substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact.”
Second, the opinion ignores controlling precedent which establishes that land use planning and zoning are two distinct exercises of sovereign power which must be considered separately. That is, in reversing the underlying order, the opinion improperly considers zoning in this land use planning determination to come to a conclusion that land use planning must be consistent with zoning, in contravention of:
• Machado v. Musgrove, 519 So.2d 629, 631 (Fla. 3d DCA 1987):
Land use planning and zoning are different exercises of sovereign power, ... therefore, a proper analysis, for review purposes, requires that they be considered separately.
(Citations omitted);
• Martin County v. Yusem, 690 So.2d 1288, 1293, 1294 (Fla.1997), holding that an amendment to a comprehen *742 sive plan even though combined with a rezoning application, must be considered separate and apart from the rezoning request:
[W]e expressly conclude that amendments to comprehensive land use plans are legislative decisions. This conclusion is not affected by the fact that the amendments to comprehensive land use plans are being sought as part of a rezoning application in respect to only one piece of property.
(Footnote omitted);
• Board of County Commissioners of Brevard County v. Snyder, 627 So.2d 469, 475 (Fla.1993), confirming that zoning follows planning, not the other way around:
[A] comprehensive plan only establishes a long-range maximum limit on the possible intensity of land use; a plan does not simultaneously establish an immediate minimum limit on the possible intensity of land use. The present use of land may, by zoning ordinance, continue to be more limited than the future use contemplated by the comprehensive plan.
(quoting Marracci v. City of Scappoose, 26 Or.App. 131, 552 P.2d 552, 553 (1976)).
Reviewing what occurred here, a landowner applied for a section 163.3187 small scale development amendment to a future land use map (FLUM).6i § 163.3187(1)(c), Fla. Stat. (2004).[7] As in Coastal Development of North Florida, Inc. v. City of Jacksonville Beach, 788 So.2d 204 (Fla.2001), the landowner also sought to have the property rezoned. There the Florida *743 Supreme Court confirmed that “small-scale development amendments ... are legislative decisions.” Id. at 210. Moreover, “[b]y its very nature, a proposed amendment to the FLUM, as an element of the comprehensive plan, requires policy reformulation because the amendment seeks a change to the FLUM.” Id. at 209.
The City of Miami, as was authorized by section 163.3187 of the Florida Statutes, decided to reformulate its policy regarding the property at issue. The City decided to change the property’s designation on the FLUM from Industrial to Restricted Commercial, based, in significant part, on the analysis of the City’s professional staff.
Petitioners sought administrative review of this legislative decision claiming that this amendment was inconsistent with virtually the entire Plan. Following an evidentiary hearing, during which City officials as well as neighboring property owners testified, an ALJ concluded that the City’s decision was “fairly debatable.” [8] The ALJ recommended to the Department of Community Affairs (herein, Department) that the City’s reformulation of its Plan for this property be approved. The Department, the state agency charged with oversight of all municipal comprehensive plans, agreed with the ALJ’s conclusions and found the amendment to be “in compliance.” See § 163.3164(20), Fla. Stat. (2004) (defining the term “state land planning agency” as the Department of Community Affairs); Coastal Dev., 788 So.2d at 207 (confirming the Department’s state-wide oversight of plan amendments).[9]
With competent substantial evidence supporting the Department’s decision and the City’s legislative reformulation of its Plan being fairly debatable, and with Petitioners having failed to demonstrate any inconsistency between that reformulation and the remainder of the Plan, the Department’s determination should have been affirmed by this court.
FACTS
Balbino Investments, LLC is the owner of a parcel of land located at 18th Avenue and Northwest North River Drive in Alla-pattah. This parcel of property is located on the northern side of the Miami River and is bounded on the south by the river, on the north by Northwest North River Drive, on the east by a condominium development, and on the west by a privately owned marina. A residential neighborhood, Durham Park, comprised primarily of single family homes, lies across the Miami River to the south.
*744 This property, previously used as a commercial marina that accommodated self-help boat repairs, is in a deteriorating neighborhood located directly west of the Jackson Memorial Hospital/University of Miami Medical School complex, the Cedars Medical Center, a Veterans Administration Hospital complex, and the Metropolitan Justice Center where a jail, the State Attorney’s office, Miami-Dade County’s criminal courts, and other government offices are located. Literally thousands of people work in this inner-city complex.
UNDERLYING PROCEEDINGS
Proceedings before the City Commission
In December 2003, Balbino filed a section 16S.3187(l)(c) application with the City of Miami seeking a small scale amendment to the FLUM to change the land use designation of this property from Industrial and General Commercial to Restricted Commercial. Balbino also sought to rezone the property to permit a 1075 unit, affordable housing[10] condominium complex with a riverfront restaurant, grade level townhouses lining the riverfront, 100 slip-marina, and public “river-walk” promenade connecting the development to a nearby public park.
Balbino’s applications were approved by the City of Miami Commission following a public hearing during which the Commission heard testimony from a number of witnesses both for and against the project. Those in favor of the applications included the City’s Assistant Planning Director, on behalf of the Planning Director — the individual expressly charged in the Plan with “making all determinations of concurrency as defined in state statutes, and ... interpreting] the [future land use] map based on all applicable state laws and administrative regulations and on consistency between the proposed change or changes and the goals, objectives, and policies expressed in the [Plan].” See Miami Comprehensive Neighborhood Plan, Vol. I, Interpretation of the Future Land Use Map, p. 13, paragraph 2.[11]
The Assistant Planning Director confirmed that the requested FLUM amendment met all applicable concurrency requirements related to recreation and open space, potable water transmission," storm sewer transmission, solid waste collection, and traffic circulation, and that the requested amendment was consistent with the Plan. A number of residents of the condominium complex immediately to the east of the proposed project also testified about the positive impact the project would have on their property and neighborhood. Residents of Allapattah testified their support for the project citing the revitalizing impact it would have on their deteriorating neighborhood.
The owner of the then-derelict marina located immediately to the west of the proposed project also supported the project for the positive impact it would have on marine businesses on the river:
Ms. Wiseheart>-Joyce: Right now, [our 88 boat slips] are empty and I’ll tell you how that came to be. Our dad bought the property in the early 1940s and leased it to the Hardy’s, who ran it as Hardy’s Boatyard ... for the past 60 years. Last year, the Hardy’s moved out and gave the property back to us empty, so we put the property on the market to sell it, but when we heard *745 about ... [Balbino’s] project ... and the bright future that [it] was going to bring to Allapattah and to the river, we took it off the market. We decided to fix it up. It was our motivation to put money into the project. We’re going to build a dock master’s house and run it as a marina, and I think that’s why [the project] is going to be good for the river. It’s going to bring people to live on the river, people who are going to have boats, and if they don’t already have boats, when they get there and see how nice it is, they’re going to want to have boats, and we hope they’re going to keep them at our marina. I know [the project] is going to have over 100 slips of their own; they’re going to have a big marina, but we hope there’s going to be a lot of people that want to keep their boats with us. Now they’re going to also want to have their boats repaired at places nearby, so other businesses are going to benefit. [This project] is going to bring jobs and life to the river.
The owner of the Miami Yacht and Engine Works (the Cummins engine dealer and a Port of Miami River “member”) also welcomed the project for the increased vitality and business — Port of Miami River business — that it would generate.
The project was opposed by the residents of Durham Park, the single-family neighborhood across the river from the proposed project, who did not want multistory buildings across the river from their single family homes. The Port of Miami River Group, Inc., an entity representing marine and industrial business owners along the Miami River, also objected to the project. It claimed that this and two other pending projects would leave only 39 of the 79 acres of marine industrial property that existed in 2000 for industrial and commercial uses in the “Port of Miami River,” a reduction that would, according to its expert, create an inconsistency between the FLUM and the text of the Plan, with its goals and policies designed to encourage and expand the Port of Miami River.
Finding that the project met section 163.3187 requirements, the City approved Balbino’s application for a small scale amendment to the Plan, concluding:
Section 3. It is found that this Comprehensive Plan designation change:
(a) is necessary due to changed or changing conditions;
(b) involves a residential land use of 10 acres or less and a density of less than 10 units per acre or involves other land use categories, singularly or in combination with residential use, of 10 acres or less and does not, in combination with other changes during the last year, produce a cumulative effect of having changed more than 60 acres through the use of “Small Scale development” procedures;
(c) is one which involves property that has not been the specific subject of a Comprehensive Plan change within the prior twelve months;
(d) is one which does not involve the same owner’s property within 200 feet of property that has been granted a Comprehensive Plan change within the prior twelve months;
(e) the proposed amendment does not involve a text change to goals, policies, and objectives of the local government’s comprehensive plan, but proposes a land use change to the future land use map for a site-specific development; and
(f) is one which is not located within an area of critical state concern.
This small scale amendment is the only order under review here.
*746 Proceedings before the Administrative Law Judge
Herbert Payne, the operator of a tugboat and towing business on the Miami River, Ann Stetser, a resident in a neighboring condominium complex, the Miami River Marine Group, and the Durham Park Neighborhood Association, Inc., petitioned for administrative review of the City Commission’s decision."1
Their amended petition made three claims: first, it claimed that the gross lot area of Balbino’s parcel exceeded the 10 acre limit for a small scale amendment; second, it claimed that there is no data or analytical support for the Commission’s determination that Balbino’s application met concurrency requirements (that is, that it satisfied sanitary and storm sewers, potable water, solid waste collection, transportation, parks, recreation and open space, coastal management, natural resources, capital improvements, and intergovernmental coordination requirements); and, third, it claimed that the FLUM amendment was inconsistent with virtually every portion of the Plan. The petition did not claim that the amendment “produced a cumulative effect of having changed more than 60 acres.”
The testimony presented at the administrative hearing which followed was generally the same as that presented to the City Commission. The assistant director of the City’s Planning Department, Lourdes Sla-zyk,,v testified that for the past twenty two years, the City had used net lot area, not gross lot area, for calculating lot size for comprehensive planning purposes and that the net lot area of this parcel is 7.91 acres. Ms. Slazyk also testified that data and information supporting this application were submitted, gathered, investigated, and considered by the City’s various departments, committees, and independent consultants which determined that this application satisfied all applicable concurrency requirements (that is, it satisfied the requirements governing sanitary and storm sewers, potable water, solid waste collection, transportation, parks, recreation and open space, coastal management, natural resources, capital improvements, and intergovernmental coordination requirements).
The testimony also was: (1) that the property is located in one of Miami’s poorest neighborhoods, which has been designated as a community redevelopment zone; (2) that the property is located only a few blocks from the Civic Center and the Jackson Memorial/University of Miami/Veterans’ Administration/Cedars Medical Center Complex, which is the second highest employment center in the City with many thousands of employees; (3) that the property is located in a neighborhood with virtually no affordable housing for these employees; and (4) that the property is located in close proximity to public transportation (Metrorail), all of which makes changing the designation of this property from Industrial and General Commercial to Restricted Commercial consistent with the multiple goals of revitalizing a struggling residential neighborhood, reducing urban sprawl, decreasing traffic and stress on infrastructure, and conserving resources.
Based on this testimony, the ALJ hearing the matter found that Balbino’s project did not exceed the 10 acre limit for a small scale amendment, that it was supported by professionally acceptable data and analysis and that it was “fairly debatable that ... the City reacted to that data and analysis in an appropriate manner.” v
The ALJ also found that Petitioners had failed to adduce any evidence whatsoever, and had, therefore, failed to satisfy their (Petitioners’) burden of proving, that the FLUM amendment was inconsistent with *747 some fifteen provisions of the Plan as Petitioners claimed. vi See Miami Comprehensive Neighborhood Plan, Volume I, Policy LU-1.2.3,™ Policy LU-1.3.1,viii Objective HO-l.l,lx Objective HO-1.2,x Objective SS-1.4,X1 Objective SS-2.1,xii Objective SS-2.2,xiii Objective SS-2.5,xiv Objective SW-1.1,xv Objective PR-1.1,Objective PR-1.4,*™ Objective CM-Ll,™ Objective CM-2.1,xix Objective CM-4.2,XX Objective NR-1.1,XX1 Objective NR-1.2,xxii Objective NR-3.2,xxiii Objective CI-1.3.xxiv
The ALJ also found that Petitioners had failed to carry their burden of proof with regard to ten remaining claims. Specifically, the ALJ rejected Petitioners’ claim that the requested change was inconsistent with Plan Goal LU-1 and Objective LU-1.2.
Goal LU-1 sets a goal for the City to:

Maintain a land use pattern that (1) protects and enhances the quality of life in the city’s residential neighborhoods; (2) fosters redevelopment and revitalization of blighted or declining areas; (3) promotes and facilitates economic development and the growth of job opportunities in the city; (4) fosters the growth and development of downtown as a regional center of domestic and international commerce, culture and entertainment; (5) promotes the efficient use of land and minimizes land use conñicts; and (6) protects and conserves the city’s natural and coastal resources.

Miami Comprehensive Neighborhood Plan, Volume I, Goal LU-1. Objective LU-1.2 states one of the objectives of this goal is to “[pjromote the redevelopment and revitalization of blighted, declining or threatened residential, commercial and industrial areas.” Miami Comprehensive Neighborhood Plan, Volume I, Objective LU-1.2.
Based on testimony that this property is located near other residential properties, including a multi-story condominium next door; that this property is located in Alla-pattah, a poor neighborhood designated for redevelopment and revitalization; that this property is located near the City’s hospital and civic centers where thousands of people are employed; that there is a lack of affordable housing in the City available for these employees; and that this Plan amendment will bring people back to the City thereby reducing urban sprawl and pressure on infrastructure and resources, the ALJ concluded that this Plan amendment was consistent with this land use goal and objective. The ALJ also concluded that changing the designation of this property to Restricted Commercial, and thereby eliminating the “excessive ... noise, smoke, fumes, illumination, traffic, hazardous wastes, [and] negative visual impact[s]” permitted in industrial areas, was not inconsistent with the criteria stated in Goal LU-1 and the objective stated in Objective LU-1.2 of the Plan.
The ALJ also found no testimony to support a conclusion that this small scale amendment is inconsistent with the criteria stated in Objective LU-1.3:
The City will continue to encourage commercial, office and industrial development within existing commercial, office and industrial areas; increase the utilization and enhance the physical character and appearance of existing buildings; and concentrate new commercial and industrial activity in areas where the capacity of existing public facilities can meet or exceed the minimum standards for Level of Service (LOS) adopted in the Capital Improvement Element (CIE).
Miami Comprehensive Neighborhood Plan, Volume I, Objective LU-1.3.
*748 The testimony was that this property had no structures on it to enhance and that it had never been used for industrial purposes. While the FLUM amendment in this case does eliminate future industrial uses on this particular parcel of property, the new designation will continue to permit commercial and office uses. As the ALJ found, the City’s concurrency analysis, which was not rebutted, confirms that the amendment meets LOS minimum standards.
The ALJ similarly found that Petitioners had failed to demonstrate any inconsistency between the amendment and the policy stated in Policy LU-1.3.6 of continuing “to encourage a diversification in the mix of industrial and commercial activities and tenants through strategic and comprehensive marketing and promotion efforts so that the local economy is buffered from national and international cycles,” with particular emphasis on the “River Corridor,” among other areas. Miami Comprehensive Neighborhood Plan, Volume I, Policy 1.3.6 (emphasis added). Other than the fact that no testimony was adduced regarding the City’s marketing and promotional efforts, the ALJ noted that the amendment permitted greater flexibility in developing this property thereby complying with this policy.
The ALJ found Objective LU-1.6, the stated objective of which is to “[rjegulate the development and redevelopment of real property within the city,” Miami Comprehensive Neighborhood Plan, Volume I, Objective LU-1.6, to be irrelevant because this objective, along with its underlying policies, relate to land development — zoning—not planning. The ALJ also found no proof of inconsistency between this objective and the amendment.
The ALJ also found no evidence to show that the amendment was inconsistent with the objective stated in Objective PW-1.2: to “[ejnsure adequate levels of safe potable water are available to meet the needs of the city.” Miami Comprehensive Neighborhood Plan, Volume I, Objective PW-1.2. The unrebutted testimony was that potable water is provided to the City by Miami-Dade County and that the City relies on the County to determine whether sufficient potable water is available. The City, according to expert testimony, enforces compliance with the County’s determination at the permitting stage so that “not a single brick may go into the ground” unless the County has confirmed that potable water is available. Because there was no testimony that this amendment will result in a shortage of potable water or that this objective does not permit the City to rely on the County’s analysis regarding this criterion,[12] the ALJ concluded that no inconsistency had been demonstrated.
Because Petitioners’ expert witness conceded that he had no expertise in traffic analysis and that the person who performed this analysis for the City had the appropriate expertise, the ALJ concluded that there was no evidence to demonstrate an inconsistency between this amendment and Objective TR-1.1 relating to roadways and traffic.xxv
The ALJ also found no inconsistency between the amendment and Objective CM-3.1, which stated objective is to “[all-low no net loss of acreage devoted to water dependent uses in the coastal area of the City of Miami.” Miami Compre *749 hensive Neighborhood Plan, Volume I, Objective CM-3.1. As the ALJ recognized, a water-dependent use is defined as a use which can “be carried out only on, in or adjacent to water areas because the use requires access to the water body for: water-borne transportation.... ” Fla. Admin. Code R. 9J-5.003(137). Because this parcel of property was in an area designated Industrial and General Commercial, which carry no requirement that property be used for any water-related or water-dependent purpose, the ALJ recognized that changing its designation to Restricted Commercial, which like the Industrial and General Commercial designations permit water-related and water-dependent uses, created no inconsistency.
The ALJ also found that the testimony that this property had previously been used as a destination for boats seeking shelter from hurricanes created no inconsistency with Objective CM-3.1, because this objective imposes no obligation on any water-front property owner, whether or not that owner uses that property for water-related or water-dependent purposes, to provide hurricane boat-shelters to members of the public.
While the parties agreed that manatees could be found in the Miami River, the ALJ found that there was no evidence that this amendment would adversely impact them so as to create an inconsistency with Objective NR-1.3 providing for maintenance and enhancement of native species of fauna and flora. See Miami Comprehensive Neighborhood Plan, Volume I, Objective NR-1.3. Rather, the ALJ found that “[i]t is fair to conclude that by eliminating the potential for development that might include such uses that involve noise, fumes, smoke, and hazardous wastes [which are permitted in industrial areas], this [amendment from Industrial and General Commercial to Restricted Commercial] will enhance the status of native species of flora and fauna.”
The ALJ rejected the claim of an inconsistency between the amendment and Objective CI-1.4, which states the objective of “[e]nsur[ing] that public capital expenditure within the coastal zone does not encourage private development that is subject to significant risk of storm damage,” observing in part that “[t]he amendment does not trigger the expenditure of public funds for capital improvements.”
Finally, the ALJ found no evidence of an inconsistency between the Port of Miami River sub-element and this amendment. Concluding that only Objective PA-3.3 applied to this amendment, the ALJ found that there was no evidence that the City failed to coordinate Port of Miami River planning with other port facilities and regulators including the U.S. Corps of Engineers, the U.S. Coast Guard, and Miami-Dade County’s Port of Miami. The evidence with regard to this objective was that pursuant to state law and City ordinance, the City submitted this amendment to the Miami River Commission, which took testimony, considered the application, and made a recommendation to the City Commission. While the River Commission recommended against this amendment, there is no requirement in this objective that the City follow the Commission’s recommendation.
Based on this evidence and these findings, the ALJ recommended that the Department of Community Affairs approve the small scale amendment granted by the City.
Proceedings before the Department of Community Affairs
Petitioners filed extensive exceptions to the ALJ’s recommendations with the Department of Community Affairs rearguing *750 their entire case. As pertinent here, Petitioners claimed that:
(1) although the ALJ considered claims that the instant small scale amendment was inconsistent with 25 Goals, Objectives, and Policies stated in the comprehensive plan, the ALJ erred in striking their claims with regard to an additional 28 Goals, Objectives, and Policies because consideration of these Goals, Objectives, and Policies was necessary “to understand the planning framework ... [and to review] the plan as a whole”;xxvi
(2) the ALJ improperly refused to recognize Payne v. City of Miami, 927 So.2d 904 (Fla. 3d DCA 2006) (“Payne II”), and in doing so improperly excluded evidence relating to “the meaning and application of the goals, objectives and policies in the subpart of the comprehensive plan called the ‘Port of Miami River’
(3) the ALJ focused too narrowly on what portions of the comprehensive plan were relevant and “failed to consider all the goals objectives and policies under goal PA-3 which collectively are intended to maintain a water-dependeni/water-related marine industrial character within the river corridor”;
(4) the ALJ erroneously relied on the Miami River Master Plan for delineating the location of the lower, middle, and upper river districts and making his recommendations and then ignored the zoning designation that same plan imposes on this property;
(5) the ALJ erred in relying on data contained in the Miami River Master Plan rather than that contained in the Miami River Corridor Urban Infill Plan3™™ to support the conclusion that the small scale amendment was appropriate for redevelopment of the Allapattah area;
(6) the size of the parcel exceeds ten acres taking it outside the provisions governing small scale plan amendments;
(7) the ALJ erred in applying a “fairly debatable” standai-d of review rather than determining whether Petitioners’ claims were supported by a preponderance of the evidence and consequently: (1) disregarded then-evidence that the amendment was inconsistent with Goal LU-1 and its subparts; (2) ovex-looked their evidence that the amendment will generate excessive traffic and be out of scale with the single family neighborhood across the river; (3) overlooked their evidence that the amendment will hamper redevelopment and revitalization of the marine industries on the river; (4) ignored their evidence that converting water-dependent uses will negatively impact marine uses on the Miami River; (5) ignored their evidence that high density multifamily residential developments miles from the City center hinders development of the downtown area and results in urban sprawl; (6) ignored their evidence that the amendment is inconsistent with the marine industrial uses on the River; and (7) ignored their evidence “i-egarding conservation of the water-dependent uses on the Miami River, which by definition is part of the city’s coastal resources”;
(8) the amendment is not supported by professionally acceptable data and analysis because the ALJ relied on data from the Miami River Master Plan rather than data from the Mia *751 mi River Corridor Urban Infill Plan and in doing so ignored data (1) from the United States Coast Guard; (2) about manatee protection; (3) about potable water and sanitary sewers; and (4) about conditions in Allapat-tah; and,
(9) the Port of Miami River Sub-element is not an optional part of the comprehensive plan and that by so defining it the ALJ improperly excluded from consideration all but Objective PA-3.3 and failed to consider any input from the Coast Guard or the Miami River Marine Group in making its determination.
Following a review of the entire record, the Secretary of the Department of Community Affairs agreed that the ALJ had improperly applied the “fairly debatable” standard in making two findings and, noting that these findings did not change the ultimate outcome, eliminated them from the recommended order. Other than making a few other minor corrections to the order, the Department rejected the remainder of Petitioners’ exceptions primarily because they either improperly argued that the ALJ erred in accepting the evidence adduced by Balbino over that adduced by Petitioners or they reargued positions “repeatedly asserted before the ALJ.” See Prysi v. Dep’t of Health, 823 So.2d 823, 825 (Fla. 1st DCA 2002) (confirming that agencies cannot reweigh evidence or make supplemental fact findings not made by ALJs); Lawnwood Med. Ctr. Inc. v. Agency for Health Care Admin., 678 So.2d 421, 425 (Fla. 1st DCA 1996) (same); Britt v. Dep’t of Prof'l Regulation, 492 So.2d 697, 700 (Fla. 1st DCA 1986), disapproved on other grounds, Dep’t of Prof'l Regulation v. Bernal, 531 So.2d 967 (Fla.1988) (confirming that the agency need not address issues raised and addressed before an ALJ).
The Department also rejected Petitioners’ argument that its claims regarding the City’s land development (.zoning) goals, objectives and policies were improperly stricken because “[s]uch goals, objectives, and policies provide direction for later decisions which implement the plan. A plan amendment, such as the subject of this case, does not implement the comprehensive plan, it changes the comprehensive plan ... [and such land development goal, objectives, and policies] are not appropriate subjects of a compliance proceeding under Chapter 163, Fla. Stat.” Payne v. City of Miami, DCA Case No. 06-GM-132, DOAH Case No. 04-2754 (Fla. Dep’t of Cmty. Affairs June 21, 2006). It also rejected the claims that the ALJ ignored the decision in Payne II, and that this property was too large to be considered as a small scale amendment. With minor corrections, the remainder of the ALJ’s recommendations were accepted, and the “small-scale comprehensive plan amendment adopted by [the City was] determined to be in compliance as defined in § 163.3184(l)(b) (2005).” Id.
OUR REVIEW
Proceedings in This Court
Petitioners appealed from the final order entered by the Department of Community Affairs finding the small scale amendment adopted by the City to be “in compliance.” Here, Petitioners, now the Appellants, argued, as they had before the Department, that: (1) the Durham Park Neighborhood Association has standing to bring this action; (2) the City may not rely on Miami-Dade County’s assessment regarding availability of potable water in determining concurrency; (3) the ALJ erred in striking “certain sections of [their] amended petition”; and, (4) the ALJ improperly ignored this court’s decision in Payne II to erroneously prevent *752 them from presenting testimony relating to the Port of Miami River sub-element of the Plan.
Not one of these claims supports reversal of the Department’s order.
1. Standing:
First, while I agree that the ALJ erred in concluding that the Durham Park Neighborhood Association did not have standing to prosecute this matter, see Sw. Ranches Homeowners Ass’n v. Broward County, 502 So.2d 931, 934 (Fla. 4th DCA 1987), I find this error to be neither dis-positive nor relevant in light of the fact that: (1) there is no dispute that the other Appellants who prosecuted this matter had standing; (2) Durham Park and the remaining parties were all represented by the same counsel; (3) Durham Park’s president testified; and (4) Durham Park did not proffer any evidence that it would have adduced but was not adduced as a consequence of this error.
2. Concurrency:
Second, the record confirms that concurrency requirements regarding potable water were met. Section 163.3180(2)(a) governing concurrency expressly authorizes local governments to “consult with the applicable water supplier to determine whether adequate water supplies” will be available and has until issuance of “a certificate of occupancy or its functional equivalent” to confirm availability. § 163.3180(2)(a), Fla. Stat. (2006). The City may, therefore, by law rely on Miami-Dade County’s assessment regarding availability of potable water in determining concurrency and has a substantial amount of time beyond the date of the enactment of a Plan amendment to obtain such an assessment. That is precisely what the testimony shows that the City is doing in this case.
3.Application of the City’s zoning ordinances to this Plan amendment:
Third, Appellants argue that the ALJ erred in failing to consider those elements of the City’s Plan addressing “land development regulations” or “development orders” because, according to Appellants, a zoning change will by necessity immediately follow the Plan amendment without these elements ever having been considered:
If Appellants are not permitted to seek enforcement of FLUM amendments on the River pertaining to the POMR sub-element, the City is capable of altering its land development regulations [zoning ordinances] and issuing development orders [zoning orders] on the River with little or no consideration of the [the Plan],
By definition, land development regulations and orders relate to zoning, not planning. See Bd. of County Commr’s of Brevard County v. Snyder, 627 So.2d 469, 474 (Fla.1993) (stating that “an order granting or denying rezoning constitutes a development order”); § 163.3164(7), Fla. Stat. (2006) (defining a development order as “any order granting, denying or granting with conditions an application for a development permit”); § 163.3164(8), Fla. Stat. (2006) (defining a development permit as including “any building permit, zoning permit, subdivision approval, rezoning, certification, special exception, variance, or any other official action of local government having the effect of permitting the development of land”); § 163.3164(23), Fla. Stat. (2006) (defining land development regulations as “ordinances enacted by governing bodies for the regulation of any aspect of development and includes any local government zoning, rezoning, subdivision, building construction, or sign regula *753 tions or any other regulations controlling the development of land”).
Zoning regulations and orders implement a Plan. They do not control it. See Machado v. Musgrove, 519 So.2d 629, 632 (Fla. 3d DCA 1987). As this court made clear in Machado, because planning and zoning are two distinct exercises of sovereign power, each must be considered separately. Id. at 631. The fact that rezoning may follow a plan amendment is not, therefore, relevant to a plan amendment determination:
[L]and development regulations are not relevant to a plan or plan amendment compliance determination. Land development regulations must be consistent with the adopted comprehensive plan, not the other way around. The comprehensive plan is implemented by appropriate land development regulations.
Robbins v. Dep’t of Cmty. Affairs & City of Miami Beach, DCA Case No. 98-051-FOF-GM, DOAH Case No. 97-0754GM, 1997 WL 1432207, at *7 (Dep’t of Cmty. Affairs Dec. 9, 1997) (citations omitted); see also Smith v. City of Panama City, Case No. 04-4364GM, 2005 Fla. Div. Adm. Hear. LEXIS 1272, at *54 (DOAH Oct. 6, 2005) (“ ‘[Consistency with land development regulations is not a compliance criterion,’ because it is not required by the definition of ‘in compliance’ with Subsection 163.3184(1)(b).” (quoting Brevard County v. Dep’t of Cmty. Affairs & City of Palm Bay, Case Nos. 00-1956GM and 02-0391GM, 2002 WL 31846455, at *11 (DOAH Dec. 16, 2002; DCA Feb. 25, 2003))).
As Snyder, 627 So.2d at 475-76, makes clear, a plan amendment does not make an immediate change in zoning a fait accom-pli:
[T]he comprehensive plan is intended to provide for the future use of land, which contemplates a gradual and ordered
growth. See City of Jacksonville Beach, 461 So.2d at 163, in which the following statement from Marracci v. City of Scappoose, 26 Or.App. 131, 552 P.2d 552, 553 (1976), was approved:
[A] comprehensive plan only establishes a long-range maximum limit on the possible intensity of land use; a plan does not simultaneously establish an immediate minimum limit on the possible intensity of land use. The present use of land may, by zoning ordinance, continue to be more limited than the future use contemplated by the comprehensive plan.
[[Image here]]
[T]he fact that a proposed use is consistent with the plan means that the planners contemplated that that use would be acceptable at some point in the future. We do not believe the Growth Management Act was intended to preclude development but only to insure that it proceed in an orderly manner.
Upon consideration, we hold that a landowner seeking to rezone property has the burden of proving that the proposal is consistent with the comprehensive plan and complies with all procedural requirements of the zoning ordinance. At this point, the burden shifts to the governmental board to demonstrate that maintaining the existing zoning classification with respect to the property accomplishes a legitimate public purpose. In effect, the landowners’ traditional remedies will be subsumed within this rule, and the board will now have the burden of showing that the refusal to rezone the property is not arbitrary, discriminatory, or unreasonable. If the board carries its burden, the application should be denied.
Because a Plan amendment is a legislative re formulation of existing policy, it is not dependent on the zoning regulations *754 that implement the policy being changed. Yusem, 690 So.2d at 1293-94. The ALJ was, therefore, correct in striking Appellants’ arguments asserting that this plan amendment was inconsistent with those portions of the Plan relating to land development — zoning—regulations and orders.
4. The Port of Miami River sub-element:
Fourth, the ALJ did not, as Appellants’ claim, ignore this court’s decision in Payne II so as to disregard this sub-element. Although the ALJ initially refused to take notice of that decision because rehearing was pending in this court, the recommended order confirms that the ALJ did take notice of the decision once that decision became final:
On March 3, 2006, Petitioners filed a Notice of Filing Additional Case Law and requested that the undersigned take official recognition of the case of Herbert Payne et al. v. City of Miami et al., 927 So.2d 904, (Fla. 3d DCA, 2005) (Payne II), which involved an appeal from a circuit court decision which dismissed for lack of standing two of four petitioners (Payne and the Marine Group) who had filed a challenge under Section 163.3215, Florida Statutes, alleging that the City’s decision to rezone the property in question and to issue a major use special permit to Intervenor was inconsistent with the Plan. The Court, by a 2-1 vote, reversed the lower court’s determination. However, because the decision was not yet final at the time of hearing, as a Motion for Rehearing and Reheaiing En Banc had been pending before that Court since November 28, 2005, the Request for Official Recognition was denied. On May 10, 2006, the Court denied the Motion for Rehearing and Rehearing En Banc, and the decision is now final. Accordingly, the earlier ruling is vacated, and the request for official recognition is granted.
(Emphasis added).
The ALJ also did not improperly ignore the purported mandate of Payne II to consider the Port of Miami River sub-element when deciding the validity of the instant Plan amendment, primarily because Payne II imposes no such mandate. Payne II deals exclusively with the standing of Herbert Payne and the Miami River Marine Group to bring suit in circuit court to challenge the City’s decision to rezone Balbino’s property; it has nothing to do with whether the Port of Miami River sub-element should or must be considered when granting the instant small scale amendment.
Even if such a mandate were imposed by Payne II, there would be no basis for reversal because the ALJ took substantial testimony regarding the meaning of the term “Port of Miami River” and application of this sub-element to this amendment. Horatio Aguirre, the president of the Durham Park Homeowners Association testified about this sub-element. So did Herbert Payne (the owner of a tug boat company doing business on the River) who testified as to the definition of the term “Port of Miami River.” Fran Bohn-sack, a representative of the Miami River Group, also testified extensively about this sub-element, as did both the City’s and the Appellants’ experts.
The ALJ’s recommended order also confirms that the ALJ actually considered this sub-element:
83.... Because [Balbino’s] property is not included within the definition of the Port of Miami River, in reviewing the application, the City adhered to its longstanding interpretation that the Sub-Element was not applicable or relevant to the analysis of the amendment’s consistency with the Plan.
*755 84. Under the majority opinion in Payne II, however, the Sub-Element appears to be relevant and is “intended to apply to the ‘uses along the banks of the Miami River[’]”, and not just to specific companies named in the definition. Even so, only Objective PA-3.3 would require consideration.
(Citation omitted) (footnotes omitted).
Addressing that objective, the ALJ observed:
85. Petitioners failed to present any evidence concerning a lack of coordination activities relative to the FLUM amendment. Coordination does not mean that adjacent local governments or other interested persons have veto power over the City’s ability to enact plan amendments.... Rather the City needs only take into consideration input from interested persons.
(Citations omitted).
A review of this sub-element demonstrates why the ALJ’s treatment ,of it was correct.
This sub-element, in pertinent part, provides:
PORTS, AVIATION AND RELATED FACILITIES
[[Image here]]
Port of Miami River1
[ !The “Port of Miami River” is simply a legal name used to identify some 14 independent, privately-owned small shipping companies located along the Miami River, and is not a “Port Facility” within the usual meaning of the term. The identification of these shipping concerns as the “Port of Miami River” was made in 1986 for the sole purpose of satisfying a U.S. Coast Guard regulation governing bilge pump outs.]
Goal PA-3: The Port of Miami River, a group of privately owned and operated commercial shipping companies located at specific sites along the Miami River, shall be encouraged to continue operation as a valued and economically viable component of the city’s maritime industrial base.
Objective PA-3.1: The City of Miami, through its Land development regulations, [zoning ordinances] shall help protect the Port of Miami River from encroachment by non water-dependent or water-related land uses, and shall regulate its expansion and redevelopment in coordination with the City’s applicable coastal management and conservation plans and policies. Objective PA-3.2: The City of Miami shall coordinate the surface transportation access to the Port of Miami River with the traffic and mass transit system shown on the traffic circulation map series.
Objective PA-3.3: The City of Miami shall coordinate its Port of Miami River planning activities with those of ports facilities providers and regulators including the U.S. Corps of Engineers, U.S. Coast Guard, and Miami-Dade County’s Port of Miami.
Miami Comprehensive Neighborhood Plan, Volume I, Goal PA-3, Objective PA-3.1, Objective PA-3.2, Objective PA-3.3. (Some emphasis added).
The stated purpose of this entire sub-element is to “encourage[ ] ... continued operation” of the commercial marine entities which operate on the Miami River. This purpose is to be achieved in three ways: first, by adoption and application of the City’s “Land development regulations”- — -that is, by its zoning ordinances; second, by coordinating surface transportation; and third, by coordinating Port of Miami River planning activities with those *756 of other ports and regulators. Of these three, only the first, relating to enactment of zoning regulations to help protect the Port of Miami River from encroachment by non water-dependent or water-related land uses, arguably has any application. However, as both Machado and Yusem make clear, consideration of the City’s zoning ordinances in this Plan amendment request is wholly inappropriate.
The ALJ did not, therefore, err in either failing to consider this element or in the consideration given to it. The only matter before the ALJ was Balbino’s application to change this property’s current Industrial and General Commercial designations to something else and the City’s legislative decision to reformulate its policy — as expressly provided by section 163.3187 — regarding this change. Because no land development, that is, zoning, issues were involved, the ALJ properly refused to consider those parts of this sub-element dealing with zoning ordinances, and based on the record and evidence before him, the ALJ properly concluded that the City’s legislative determination to reformulate its policy regarding this property was supported by the record and fairly debatable. That determination, approved as it was by the Department of Community Affairs, should have been affirmed.
This Court’s Opinion and Reconsideration on Rehearing en Banc
Although the claims actually raised by Appellants have no merit, this court concluded that the ALJ erred: (1) in either failing to permit Appellants to introduce evidence concerning, or in failing to consider, inconsistencies between the requested amendment and (a) the Port of Miami River sub-element and (b) the Future Land Use and Coastal Management elements of the City’s Plan; and (2) in making findings unsupported by the evidence. The opinion also “note[s]” that “these ‘small scale’ amendments, when viewed together as a whole, are changing the character of the Miami River waterfront without proper long range planning or input from appropriate agencies, departments, and citizen groups.” These determinations ignore both controlling law and the record.
1. No consideration of the cumulative effect of other small scale amendments is appropriate in this case.
There can be no doubt that the driving force behind the instant opinion is the conclusion, stated in the last paragraph, that the instant small scale amendment, when viewed with other pending amendments, improperly changes the character of the Miami River waterfront:
We further note that these ‘small scale’ amendments, when viewed together as a whole, are changing the character of the Miami River waterfront without proper long range planning or input from appropriate agencies, departments, and citizen groups. Because the Miami River is such an important asset to the City, County, and State, such piecemeal, haphazard changes are not only ill-advised, they are contrary to the goals and objectives of those who worked together, debated, and determined how the Miami River waterfront should be developed. If the City’s vision for the Miami River has changed, then that change should be clearly reflected in its Comprehensive Plan to provide industries and land owners along the Miami River with fair notice.
Payne, 06-1799, substituted opinion.
This conclusion stems from the faulty determination, made many paragraphs earlier, that section 163.3187(l)(c), which governs this action, does no more that provide “an exception to the time limitation for small scale amendments to the comprehensive plan if ... [t]he proposed *757 amendment involves the use of 10 acres or fewer and ... the proposed amendment involves a residential land use ... [that] has a density of 10 units or less per acre.” Id.
Section 163.3187(l)(c), is not, however, so limited. This provision also expressly authorizes an unlimited number of such amendments so long as they do not exceed a stated cumulative annual acreage limit:
a. The cumulative annual effect of the acreage for all small scale development amendments adopted by the local government shall not exceed:
(I) A maximum of 120 acres in a local government that contains areas specifically designated in the local comprehensive plan for urban infill, urban redevelopment, or downtown revitalization as defined in s. 163.3164, urban infill and redevelopment areas designated under s. 163.2517, transportation concurrency exception areas approved pursuant to s. 163.3180(5), or regional activity centers and urban central business districts approved pursuant to s. 380.06(2)(e); however, amendments under this paragraph may be applied to no more than 60 acres annually of property outside the designated areas listed in this sub-sub-sub-paragraph. Amendments adopted pursuant to paragraph (k) shall not be counted toward the acreage limitations for small scale amendments under this paragraph.
(II) A maximum of 80 acres in a local government that does not contain any of the designated areas set forth in sub-sub-subparagraph (I).
(III) A maximum of 120 acres in a county established pursuant to s. 9, Art. VIII of the State Constitution.
§ 163.3187(1)(c)1.a.(I)-(III), Fla. Stat. (2006) (emphasis added); Coastal Dev., 788 So.2d at 207 (confirming that under section 163.3187(1)(c)1.a. “[a] local government is limited to a cumulative acre limit per year of total area within that government’s boundaries that may be subject to small-scale amendments”) (footnote omitted).
By virtue of these provisions, the Florida Legislature has determined (and the Florida Supreme Court in Coastal Development has confirmed) that “piecemeal” changes to a Plan such as the change at issue here, which do not individually or collectively exceed the cumulative annual acreage identified in the statute, do not change the character of an area or neighborhood so as to require any “long range planning,” or input from any agencies, departments, or groups as the opinion suggests. Thus, notwithstanding this court’s broad statement that such changes are “ill-advised” or “haphazard,” they are nonetheless expressly authorized by law.
The record in this case reflects that whether considered alone or in combination with any others this amendment does not exceed the cumulative acreage limitations set by section 163.3187. This perhaps explains why Appellants did not challenge below the City’s express determination that the cumulative effect of this amendment did not exceed that authorized by section 163.3187(l)(c)l.a.(I)-(III).
Because the instant small scale amendment met all of the requirements imposed by section 163.3187, the City’s legislative decision to change the designation for this parcel should have been reviewed solely to determine whether that decision was supported by competent, substantial evidence and was internally consistent with the remainder of the Plan — not whether it met criteria outside the requirements of section 163.3187(l)(c).
2. There is no inconsistency between the Port of Miami River sub-element and this small scale amendment.
The ALJ did not err in either failing to consider, or in considering, the Port of *758 Miami River sub-element because no inconsistency between that sub-element and the instant small scale amendment exists.
Section 163.3187 provides that comprehensive plans may only be amended in such a way as to preserve the “internal consistency” of a Plan. § 163.3187(2), Fla. Stat. (2004); Coastal Dev., 788 So.2d at 208 (stating that the “FLUM must be internally consistent with the other elements of the comprehensive plan”) (footnote omitted). Balbino sought to amend the future land use map element of the City’s plan to change only the Industrial and General Commercial designations of this particular property to Restricted Commercial. This change created no inconsistency with the Port of Miami River sub-element of the Plan.
First, and no matter how the term “Port of Miami River” is defined (that is, as either “a legal name used to identify some 14 independent privately owned small shipping companies located along the Miami River,” as expressly stated in the footnote to this element, or as any other “use” on the banks of the river as stated in Payne II), this sub-element mandates no particular land use designation for this “port.” See Payne II, 927 So.2d at 908. Thus, this change to the land use map, on its face, creates no internal inconsistency with this sub-element.
Second, the limited change requested by Balbino is not in any manner inconsistent with either the stated goals, objectives or policies of this sub-element. The single stated goal of this sub-element is to “encourage” continued operation of the Port of Miami River, not to ensure its existence at the expense of other property owners on the Miami River:
Goal PA-3: The Port of Miami River, a group of privately owned and operated commercial shipping companies located at specific sites along the Miami River, shall be encouraged to continue operation as a valued and economically viable component of the city’s maritime industrial base.
Miami Comprehensive Neighborhood Plan, Volume I, Goal PA-3, (emphasis added).
The manner in which this goal is to be achieved is not through designations on the future land use map, but by enactment of land development regulations, that is, by enactment of zoning ordinances:
Objective PA-3.1: The City of Miami, through its Land development regulations [zoning regulations], shall help protect the Port of Miami River from encroachment by non water-dependent or water-related land uses, and shall regulate its expansion and redevelopment in coordination with the City’s applicable coastal management and conservation plans and policies.
Policy PA-3.1.1: The City shall use its land development regulations [zoning regulations] to encourage the establishment and maintenance of water-dependent and water-related uses along the banks of the Miami River, and to discourage encroachment by incompatible uses.
Policy PA-3.1.2: The City shall, through its land development regulations [zoning regulations], encourage the development and expansion of the Port of Miami River consistent with the coastal management and conservation elements of the City’s Comprehensive Plan.
Policy PA-3.1.3: The City shall, through its land development regulations [zoning regulations], encourage development of compatible land uses in the vicinity of the Port of Miami River so as to mitigate potential adverse impacts arising from the Port of Miami *759 River upon adjacent natural resources and land uses.
Miami Comprehensive Neighborhood Plan, Volume I, Objective PA-3.1, Policy PA-3.1.1, Policy PA-3.1.2, Policy PA-3.1.3 (emphasis added).
The instant land use designation change on the FLUM from Industrial to Restricted Commercial cannot, therefore, be incompatible with this objective and its policies for the simple reason that planning is not zoning and changing the Plan does not automatically result in changing the zoning. Snyder, 627 So.2d at 475 (observing “[t]he present use of land may, by zoning ordinance, continue to be more limited than the future use contemplated by the comprehensive plan”).
Third, this change in designation gives rise to no inconsistency with the remainder of the sub-element. The second Objective to this sub-element, Objective PA-3.2 and its single Policy deal with coordinating surface transportation access to the Port of Miami River with the mass transit system shown on the traffic circulation map:
Objective PA-3.2: The City of Miami shall coordinate the surface transportation access to the Port of Miami River with the traffic and mass transit system shown on the traffic circulation map series.
Policy PA-3.2.1: The City of Miami shall, through the Transportation Element of the Comprehensive Plan, coordinate intermodal surface and water transportation access serving the Port of Miami River.
Miami Comprehensive Neighborhood Plan, Volume I, Objective PA-3.2, Policy PA-3.2.1.
There is no evidence whatsoever that this Objective and its Policy apply to the instant amendment much less that the amendment is inconsistent with them.
The third Objective, PA-3.3, states only that the City of Miami will “coordinate its Port of Miami River planning activities with those of ports facilities providers and regulators including the U.S. Corps of Engineers, U.S. Coast Guard, and Miami-Dade County’s Port of Miami.” Its single Policy, PA-3.3.1, states that the City, “through its Intergovernmental Coordination Policies,” will support the functions of the Port of Miami River. See Miami Comprehensive Neighborhood Plan, Volume I, Objective PA-3.3, Policy PA-3.3.1..As to this Objective and Policy, the testimony was that this application was submitted to the Miami River Commission, the clearinghouse for all interests on the Miami River and that the Commission made a recommendation against it. This element requires only coordination with such an entity; it does not bind the City to its recommendations. The requirements of this Objective and Policy were met.
In sum, this small scale amendment to the FLUM to redesignate Balbino’s property as Restricted Commercial is not, as a matter of law, inconsistent with this sub-element.
Despite the fact that no inconsistency could be nor was demonstrated to exist between the Port of Miami River sub-element and the FLUM as a consequence of this small scale amendment, the opinion focuses on Objective PA-3.1 of this sub-element and its policy regarding land development regulations — that is zoning ordinances — to conclude that the FLUM amendment is inconsistent with the Comprehensive Plan.
The majority opinion buttresses its conclusion with Ms. Slazyk’s testimony that land use and zoning “need to be compatible.” However it is the land use designation that is determinative. The opinion itself quotes Ms. Slazyk’s acknowledgement that “The major use is seen as the *760 umbrella that covers all of the subordinate reviews and approvals.... ” Supporting its decision, the majority puts the cart before the horse.
Thus, the majority’s conclusion and the analysis by which it is reached directly conflict with the determination made by both the Florida Supreme Court and this court that zoning ordinances must be consistent with a comprehensive plan, not the other way around. Specifically, the conclusion that because “[t]he Balbino property was, for the most part, zoned SD-4.2 Waterfront Industrial ... its land use designation was by necessity, identified as Industrial,” is directly contrary to the determination in Snyder that “[t]he local plan must be implemented through the adoption of land development regulations [zoning ordinances] that are consistent with the plan.” Snyder, 627 So.2d at 473, 474 (citation omitted) (“Because an order granting or denying rezoning constitutes a development order and development orders must be consistent with the comprehensive plan, it is clear that orders on rezoning applications must be consistent with the comprehensive plan.”); see also Coastal Dev., 788 So.2d at 209 (stating that “a proposed zoning change ... must be consistent with the FLUM”); Machado, 519 So.2d at 632 (“local comprehensive plans ... are not zoning laws. [Chapter 163] require[s] that all zoning action conform to [the] approved land use plan”). As these decisions confirm, zoning follows planning; planning is not affected by zoning. Thus, the statement that because this property was zoned SD-4.2 it necessarily had to be designated as Industrial is wholly inimical to controlling law.
So too is the suggestion that because “the FLUM Amendment will permit residential use, a land use specifically precluded by the SD-4.2 land development classification ... by changing the land use, the FLUM Amendment [will] dramatically change[ ] the permitted land development [zoning] uses.” Payne, 06-1799, substituted opinion. As the Supreme Court in Snyder confirmed, the fact that a rezoning request is consistent with a new use designation does not mean that the rezoning request will or must be granted:
Further, we cannot accept the proposition that once the landowner demonstrates that the proposed use is consistent with the comprehensive plan, he is presumptively entitled to the use.... We do not believe that a property owner is necessarily entitled to relief by proving consistency when the board action is also consistent with the plan.
Snyder, 627 So.2d at 475.
A change in a land use designation does not, therefore, equate with a change in zoning.
In short, the fact that this parcel of property is zoned SD-4.2, is wholly irrelevant as to whether changing the land use designation of this property from Industrial to Restricted Commercial is consistent with the Port of Miami River sub-element. Moreover, because the Port of Miami River sub-element, as pertinent here, relates to land development orders — that is zoning — it too is wholly irrelevant and can give rise to no conflict with the instant amendment. Thus, I find that this court’s conclusion that the Department’s final order approving the ALJ’s determination had to be reversed because the ALJ failed to take into consideration “the goal, objectives, and policies of the Port of Miami River subelement [which relates to zoning],” is contrary to both the record and controlling law.
3. There is no inconsistency between this amendment and the Future Land Use element of the Plan.
The Future Land Use element sets forth broad goals for the City’s Plan as a whole:
*761 FUTURE LAND USE
Goal LU-1: Maintain a land use pattern that (1) protects and enhances the quality of life in the city’s residential neiyhborhoods; (2) fosters redevelopment and revitalization of blighted or declininy areas; (3) promotes and facilitates economic development and the yrowth of job opportunities in the city; (4) fosters the growth and development of downtown as a regional center of domestic and international commerce, culture and entertainment; (5) promotes the efficient use of land and minimizes land use conñicts; and (6) protects and conserves the city’s significant natural and coastal resources.
Objective LU-1.2: Promote the redevelopment and revitalization of blighted, declining or threatened residential, commercial and industrial areas.
Objective LU-1.5: Land development regulations [zoning ordinances] will protect the city’s unique natural and coastal resources, and its historic and cultural heritage.
Objective LU-1.6: Regulate the development or redevelopment of real property within the city to insure consistency with the goals, objectives and policies of the Comprehensive Plan.
Miami Comprehensive Neighborhood Plan, Volume I, Goal LU-1, Objective LU-1.2, Objective LU-1.5, Objective LU-1.6.
Changing the designation for this particular property on the FLUM creates no inconsistency with this element internally or otherwise.
The testimony from Lourdes Slazyk, the assistant director of Planning for the City,[13] was that this amendment will permit construction of affordable housing, a riverwalk to a nearby park, and a 100 slip marina where a derelict boat repair facility now sits. According to this expert witness, this change in designation will foster redevelopment and revitalization in, and enhance the quality of life of, neighboring Allapattah, a poor residential neighborhood already designated as a community redevelopment zone. This witness also confirmed that this amendment will facilitate economic development and the growth of job opportunities in the City by providing much needed affordable housing to thousands of individuals employed in the immediate vicinity, and will bring them and their families back to the City from outlying areas. This witness further confirmed that bringing employees and their families from outlying areas back to the City where they work will (1) result in more efficient land use by reducing urban sprawl; (2) reduce traffic and stress on infrastructure; (3) reduce stress on the Everglades thereby conserving natural resources; and (4) foster economic growth and development in the City itself (as opposed to outlying suburbs somewhere else). This testimony confirms that this *762 amendment is consistent with this element and its objectives.
Rather than focusing on this testimony, the opinion reweighs the evidence to focus on the rejected testimony of two of Appellants’ witnesses. The first, Ann Stetser, a neighborhood resident, testified that traffic will increase as a consequence of the instant development. This is not competent, substantial evidence on this issue. See DeGroot v. Sheffield, 95 So.2d 912 (Fla.1957) (stating that competent substantial evidence is that which a reasonable mind would accept as adequate to support a conclusion); City of Hialeah Gardens v. Miami-Dade ChaHer Found., Inc., 857 So.2d 202, 204 (Fla. 3d DCA 2003) (observing that “generalized statements in opposition to a land use proposal, even those from an expert, should be disregarded”). It also was contradicted by the second witness, Jack Luft, Appellants’ expert, who after admitting that he lacked the requisite expertise to opine on this subject, confirmed that this subject is not relevant to a small scale amendment. And, although Mr. Luft did, as the opinion notes, testify that the Miami River and its marine industrial base provide significant jobs and economic enhancement to the City, this court is not free to accept this testimony over that accepted by the ALJ and which fully supports this amendment. See § 120.68(7)(b), Fla. Stat. (2004) (stating that “the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact”); Roche Sur. & Cas. Co. v. Dep’t of Fin. Servs., Office of Ins. Regulation, 895 So.2d 1139, 1141 (Fla. 2d DCA 2005) (“On appellate review of the agency order, the issue for the appellate court is whether the record contains evidence sufficient to support the original finding of fact by the ALJ.”); Yaeger v. Fla. Unemployment Appeals Comm’n, 786 So.2d 48, 51 (Fla. 3d DCA 2001) (“Generally speaking, neither the UAC or this court may reweigh the evidence and substitute its findings for those of the referee. See Grossman v. Jewish Community Center of Greater Fort Lauderdale, Inc., 704 So.2d 714, 716 (Fla. 4th DCA 1998); Studor, Inc. v. Duren, 635 So.2d 141, 142 (Fla. 2d DCA 1994); Verner v. Unemployment Appeals Comm’n, 474 So.2d 909 (Fla. 2d DCA 1985) ... section 120.57, Fla. Stat. (1999).”).[14]
*763 Changing the designation of this parcel of property on the FLUM from Industrial and General Commercial to Restricted Commercial created no internal or other inconsistency with the Future Land Use element of the Plan. To the contrary, the evidence that was accepted by the ALJ was that it advanced the goals of the land use element. This determination should have been affirmed.
4. There is no inconsistency between this amendment and the Coastal Management element of the Plan.
The instant change to the FLUM also created no inconsistency with the Coastal Management element of the Plan. This element states that the City will provide an “adequate” supply of land for water dependent uses with the objective of allowing no “net loss” of acreage devoted to water dependent uses in the coastal area of the entire City, not just along the Miami River:
Goal CM-3: Provide an adequate supply of land for water dependent uses. Objective CM-3.1: Allow no net loss of acreage devoted to water dependent uses in the coastal area of the City of Miami.
Miami Comprehensive Neighborhood Plan, Volume I, Goal CM-3, Objective CM-3.1.
Appellants presented no testimony whatsoever as to the “net” number of acres devoted to “water dependent” uses in the coastal area of the City. Nor did they present evidence as to whether this amendment will result in a “net” loss of acreage devoted to such uses. More to the point, changing the FLUM designation of this property from Industrial and General Commercial to Restricted Commercial— the change of which is all that is involved in this amendment — implicates no water use, dependent or otherwise, at all:
*764 Industrial: The areas designated as “industrial” allow manufacturing, assembly and storage activities. The “Industrial” designation generally includes activities that would otherwise generate excessive amounts of noise, smoke, fumes, illumination, traffic, hazardous wastes, or negative visual impact unless properly controlled. Stockyards, rendering works, smelting and refining plants and similar activities are excluded. Residential uses are not permitted in the “industrial” designation, except for rescue missions, and live-aboards in commercial marinas.
[[Image here]]
General Commercial: Areas designated as “General Commercial” allow all activities included in the “Office” and the “Restricted Commercial” designations, as well as wholesaling and distribution activities that generally serve the needs of other businesses; generally require on and off loading facilities; and benefit from close proximity to industrial areas. These commercial activities include retailing of second hand items, automotive repair services, new and used vehicle sales, parking lots and garages, heavy equipment sales and service, building material sales and storage, wholesaling, warehousing, distribution and transport related services, light manufacturing and assembly and other activities whose scale of operation and land use impacts arc similar to those uses described above. Multifamily residential structures of a density equal to R-3 or higher, but not to exceed a maximum of 150 units per acre, are allowed by Special Exception only, upon finding that the proposed site’s proximity to other resi-dentially zoned property makes it a logical extension or continuation of existing residential development and that adequate services and amenities exist in the adjacent area to accommodate the needs of potential residents. This category also allows commercial marinas and living quarters on vessels for transients.
Miami Comprehensive Neighborhood Plan, Vol. I, Interpretation of the Future Land Use Map, p. 18, paragraph 3-p. 19, paragraph 2.
Changing these designations to a Restricted Commercial designation, which like the Industrial and General Commercial designations neither mandates water dependent uses nor precludes them, cannot, therefore, create an internal inconsistency with this element of the Plan.
To get around this, the opinion relies on zoning regulations and a 1986 economic study cited in Volume II of the Plan:
The Balbino FLUM Amendment to the Comprehensive Plan, changing the land use designation, which is primarily Industrial to Restricted Commercial, and the zoning from, SD — i.2 Waterfront Industrial to Restricted Commercial, will result in a net loss of acreage devoted to water-dependent use. The loss of acreage specifically reserved for water-dependent or water-related use conflicts with Coastal Management Goal CM-3. Instead of “[p]rovid[ing] an adequate supply of land for water dependent uses,” ... “[a]llow[ing] no net loss of acreage devoted to water dependent uses in the coastal area of the City of Miami,” and using its land use regulations to “encourage water dependent uses along the shoreline,” these changes to this property’s land use [and zoning] will deplete land specifically reserved by the City for Industrial water-dependent uses in its Comprehensive Plan.
The Comprehensive Plan’s goals, objectives, and policy considerations regarding coastal areas, and specifically those coastal areas along the Miami River, are in recognition of how important *765 the shipping industry and other water-dependent uses are to the City’s economy.
In view of the importance to the local economy, the limited available areas suitable for high intensity water dependent uses, and strong population pressures of the 1960’s, the City created in the mid 1960’s a zoning classification entitled Waterfront Industrial. This zoning classification strictly prohibits uses that are not directly related to waterfront activities.
[[Image here]]
Since any new water dependent or related facilities would involve redevelopment of existing waterfront properties, these zoning ordinances are considered sufficient to insure that adequate land area for water-dependent or related uses is protected.
[[Image here]]
Along the Miami River, an economic study in 1986 reported that the firms located in the study area ... have a significant impact on the Miami economy. They employ an estimated 7,000 workers on a full time basis and over 600 part time. Total sales are estimated at $613 million, or about $87,000 for a full time worker. An additional indirect impact of $1.2 billion of business activity in the Miami area is created by firms in the study area. Many of the firms located in the study area are marine related businesses in part composed of water dependent and water related activities.
Miami Comprehensive Neighborhood Plan 1989-2000, Volume II, Data and Analysis, Coastal Management Element (emphasis added).
Payne, 06-1799, substituted opinion (some emphasis added).
Zoning is not, as already stated, planning and consideration of zoning ordinances in a planning consistency determination simply is not appropriate. Robbins v. Dept. of Cmty. Affairs, 1997 WL 1432207, at *7 (“[L]and development regulations are not relevant to a plan or plan amendment compliance determination. Land development regulations must be consistent with the adopted comprehensive plan, not the other way around. The comprehensive plan is implemented by appropriate land development regulations.”) (citations omitted); see Smith v. Panama City, 2005 WL 2484796 at *20 (“ ‘[Consistency with land development regulations is not a compliance criterion,’ because it is not required by the definition of ‘in compliance’ under Subsection 163.3184(1)(b).” (quoting Brevard County v. Dep’t of Cmty. Affairs & City of Palm Bay, Case Nos. 00-1956GM and 02-0391GM, 2002 WL 31846455 at *11)); see also Machado, 519 So.2d at 632. The fact that the two matters went before the Commission at the same time does not change that result.
And, in 1992, six years after the economic study cited above, the City adopted in principle the Miami River Master Plan. This report or plan has never become, by amendment or otherwise, part of the City’s Comprehensive Plan and cannot, therefore, give rise to any inconsistency with the instant amendment. This plan confirms that contrary to the rosy picture painted in 1986, a majority of the water dependent uses on the Miami River (such as commercial shipping, marinas, fisheries, boat yards and some boat sales) were in decline:
Problems Facing Small Boatyards and Marinas
While there are a number of boat repair facilities that have a growing business, many of the marinas and small boatyards (under 10 employees) on the Mia *766 mi River have experienced a contraction in business activity since 1985. In fact, four of the 26 small boatyards and marinas identified in 1985 by the draft Biscayne Bay Aquatic Preserve Management Plan, are no longer in business nor have they been replaced by a marine business.
One factor affecting this decline has been the rapid expansion of competing facilities in Broward County.... The problems for marinas and small boatyards have been deepened by the recessionary climate.... Further, the reputation of the river as a hurricane sanctuary was undermined as a result of statements by the South Florida Water Management District (later retracted) regarding the potential of a wall of flood water being released into the Miami River from the Everglades....
[[Image here]]
[The Seafood Industry]
There have been significant changes in the character of the fishing industry during the last several decades resulting from the level of catch available domestically, competitiveness of U.S. fishing vessels, and the economics of the processing and distribution end of the business.
[[Image here]]
The current level of direct employment in both processing and wholesale activity by Miami River fisheries is 150. In the survey of businesses on the river, comments from the owners of these fish establishments indicated that much of the seafood arrived by truck, and that the Keys and the airport were important sources. Although for many, location on the waterfront is no longer critical to their operation, the Miami River area does provide good access to major arte-rials and the proximity to the air and sea ports.
Miami River Master Plan at 1.8,1.10.
In short, there is no evidence that changing the land use designation of for this small parcel of property from Industrial and General Commercial to Restricted Commercial will have any effect whatsoever on the supply of land for water dependent uses or that it will result in a net loss of acreage devoted to water dependent uses in the coastal area of the entire City. Because neither the evidence nor applicable law supports the majority’s conclusion that this small scale amendment is inconsistent with the Coastal Management Element of the City’s Plan, the Department’s order should have been affirmed.
CONCLUSION
The City of Miami made a legislative decision to grant a property owner’s application for a small scale amendment to the future land use element of the City’s Comprehensive Plan. When challenged, on administrative review, the ALJ hearing the matter found the City’s decision to be supported by the evidence and professionally acceptable data and concluded that the decision was “in compliance.” The Department of Community Affairs agreed with that determination and also found the amendment to be “in compliance.” Because this decision is fully supported by both the evidence and applicable controlling law, it should have been affirmed. Accordingly, and for the reasons stated herein, I would grant rehearing en banc, withdraw the current opinion and affirm.
GERSTEN, SHEPHERD, and SUAREZ, JJ., concur.
Endnotes
‘By law a local comprehensive land use plan must include a number of elements, *767 one of which is a future land use element. The future land use map (FLUM) is a component of the future land use element of the comprehensive plan. See § 163.3177(6)(a), Fla. Stat. (2006).
A comprehensive plan is composed of several elements. One element of the comprehensive plan is the future land use element. The future land use element designates “proposed future general distribution, location, and extent of the uses of land for residential uses, commercial uses, industry, agriculture, recreation, conservation, education, public buildings and grounds, other public facilities, and other categories of the public and privates uses of land.” The future land use map (FLUM) is a component of the future land use element of the comprehensive plan. See Yusem, 690 So.2d at 1292. The FLUM is a pictorial depiction of the future land use element and is supplemented by written “goals, policies, and measurable objectives.”
Coastal Dev. of N. Fla., Inc. v. City of Jacskonville Beach, 788 So.2d at 207-08 (footnotes omitted); see also § 163.3177, Fla. Stat. (2006) (delineating the mandatory and optional elements of comprehensive plans).
"The Planning and Zoning Department’s analysis noted that the sanitary sewer concurrency requirement had to be met by obtaining a permit from the Metro-Dade Water and Sewer Authority Department (WASA).
111 Section 163.3187(3)(a), Florida Statutes (2006), sets out the initial step in the procedure to challenge the compliance of a small scale development amendment:
The state land planning agency shall not review or issue a notice of intent for small scale development amendments which satisfy the requirements of paragraph (l)(c). Any affected person may file a petition with the Division of Administrative Hearings pursuant to ss. 120.569 and 120.57 to request a hearing to challenge the compliance of a small scale development amendment with this act within 30 days following the local government’s adoption of the amendment, shall serve a copy of the petition on the local government, and shall furnish a copy to the state land planning agency. An administrative law judge shall hold a hearing in the affected jurisdiction not less than 30 days nor more than 60 days following the filing of a petition and the assignment of an administrative law judge. The parties to a hearing held pursuant to this subsection shall be the petitioner, the local government, and any intervenor. In the proceeding, the local government’s determination that the small scale development amendment is in compliance is presumed to be correct. The local government’s determination shall be sustained unless it is shown by a preponderance of the evidence that the amendment is not in compliance with the requirements of this act. In any proceeding initiated pursuant to this subsection, the state land planning agency may intervene.
iv Ms. Slazyk, who holds a Bachelor of Arts degree in Architecture from the University of Miami, has been employed in the City’s Planning Department for over 22 years.
vThe testimony was that the data and information regarding compliance with these requirements, while not spread on the record as part of the Planning Department’s formal recommendation, exists and is available to the public on request. As the Planning Department’s report to the City Commission notes, because water is supplied to City occupants by Miami-Dade County, compliance with this criterion is determined by the County, not the City, and thus addressed by the City at the *768 permitting stage. With regard to traffic, the ALJ correctly noted what petitioners’ expert stated, that traffic concurrency requirements do not apply to small scale amendments.
viThe parties rely upon the August 2004 version of the Comprehensive Plan, which has been quoted extensively herein.
vii Policy LU-1.2.3: The City’s residential, commercial and industrial revitalization programs will continue to place highest priority on protecting neighborhoods threatened with declining conditions, second priority to reversing trends in declining areas, and third priority to removing blighted conditions, and the City will continue its efforts to secure federal and state aid in developing comprehensive redevelopment programs.
viii Policy LU-1.3.1: The City will continue to provide incentives for commercial redevelopment and new construction in the Edison Center, Latin Quarter, Little Haiti, Little River Industrial District, River Corridor, Design District, Grand Avenue, Fla-gler Street, the River Quadrant, the Omni Area Redevelopment District, and Southeast Overtown/Park West (N.W. 3 Avenue) and other areas where such redevelopment will contribute to the improvement in the built environment. Such incentives may be offered through the building fagade treatment program, Community Development Block Grant (CDBG) funds, and other redevelopment assistance programs.
ix Objective HO-1.1: Provide a local regulatory, investment, and neighborhood environment that will assist the private sector in increasing the stock of affordable housing within the city at least 10 percent by 2005.
x Objective HO-1.2: Conserve the present stock of low and moderate-income housing within the city and reduce the number of substandard units through rehabilitation, reduce the number of unsafe structures through demolition, and insure the preservation of historically significant housing through identification and designation.
xi Objective SS-1.4: The City of Miami’s sanitary sewer collection system is a valuable and costly element of the urban infrastructure, and its use is to be maximized in the most efficient manner.
xii Objective SS-2.1: In accordance with the 1986 Storm Drainage Master Plan and subsequent updates, the City will address the most critical drainage problems. The City’s goals for retrofitting subcatchment areas within the city will meet or exceed the 5-year frequency, 24-hour duration standard while utilizing water quality design criteria. The City will confer with local agencies, namely the Miami-Bade County Department of Environmental Resources Management (DERM) when retrofitting City projects to incorporate design criteria and best management practices (BMPs).
xiii Objective SS-2.2: The practice of stormwater management within the city will be designed to reduce pollutant-loading rates to surface waters.
xiv Objective SS-2.5: The City of Miami’s storm drainage system is a valuable and costly element of the urban infrastructure, and its use is to be maximized in the most efficient manner to serve this fully developed community.
’"'Objective SW-1.1: The City will continue to provide solid waste collection services to city residents and businesses in a manner that ensures public health and safety, and a clean urban environment.
Objective PR-1.1: Increase public access to all identified recreation sites, facilities and open spaces including the Miami River and beaches and enhance *769 the quality of recreational and educational opportunities for all age groups and handicapped persons within the city’s neighborhoods.
xvii Objective PR-1.4: Ensure that future development and redevelopment pay an equitable, proportional share of the cost of public open space and recreational facilities required to maintain adopted LOS standards.
xviii Objective CM-1.1: Preserve and protect the existing natural systems including wetlands and beach/dune systems within Virginia Key and those portions of Biscayne Bay that lie within the City’s boundaries; and improve water quality within the Miami River, its tributaries and the Little River.
xix Objective CM-2.1: Prevent the net loss of, and, where feasible, increase, physical and visual public access to Biscayne Bay and the city’s shoreline.
’“Objective CM-4.2: The City will adhere to and cooperate with the County in executing evacuation procedures as well as annually update information and procedural brochures for the public; these brochures will contain information on evacuation procedures and routes, and will be distributed to city residents at local businesses and government agencies.
xxi Objective NR-1.1: Preserve and protect the existing natural systems within Virginia Key, the Dinner Key spoil islands, and those portions of Biscayne Bay that lie within the City’s boundaries.
xxii Objective NR-1.2: Improve the water quality of, and ensure health safety within, the Miami River, its tributaries and the Little River.
xxiii Objective NR-3.2: Prevent the degradation of ambient air quality within the city.
xxiv Objective CI-1.3: Ensure that future development and redevelopment pay an equitable, proportional share of the cost of public facilities required to maintain adopted LOS standards.
xxv Objective TR-1.1: All arterial and collector roadways under County and State jurisdiction that lie within the City’s boundaries will operate at levels of service established by the respective agency. All other City streets will operate at levels of service that are consistent with an urban center possessing an extensive urban public transit system and characterized by compact development and moderate-to-high residential densities and land use intensities, and within a transportation concurrency exception area (TCEA). The City will monitor the levels of service of all arterial and collector roadways to continue to develop and enhance transportation strategies that promote transit and minimize the impacts of the TCEA.
XXVI Eleven of these items deal solely with zoning: Objective LU-1.1 and its Policies LU-1.1.1 and LU-1.1.3 require (1) development regulations and orders — that is zoning regulations and orders — that meet minimum level of service standards as adopted in the Capital Improvements Element of the comprehensive plan, and (2) a “zoning ordinance” that protects against encroachment of incompatible land uses, adverse impacts that degrade public health and safety, and transportation policies that fragment established neighborhoods. Miami Comprehensive Neighborhood Plan, Volume I, Objective LU-1.1, Policy LU-1.1.1, Policy LU-1.1.3.
Objective LU-1.5 states that land development regulations — that is, zoning regulations — will protect the City’s natural and coastal resources. Miami Comprehensive Neighborhood Plan, Volume I, Objective *770 LU-1.5. Policy LU-1.5.1 mandates development orders — zoning orders — that are “consistent with the goals, objectives and policies of the Natural Resource Conservation and Coastal Management elements of the Miami Comprehensive Neighborhood Plan.” Miami Comprehensive Neighborhood Plan, Volume I, Policy LU-1.5.1.
Policy LU-1.6.5 states that special district designations will be used as “a land development regulation [zoning ] instrument.” Miami Comprehensive Neighborhood Plan, Volume I, Policy LU-1.6.5. Policy LU-1.6.9 states that land development regulations — that is, “zoning regulations — will mitigate adverse impacts of future development.” Miami Comprehensive Neighborhood Plan, Volume I, Policy LU-1.6.9.
There is no “LU-1.10” as suggested by Petitioners’ exceptions.
Policies HO-1.1.5, HO-1.1.7, and HO-1.1.8 are policies that implement an objective to “assist the private sector in increasing the stock of affordable housing within the city by at least 10 percent by 2005.” Miami Comprehensive Neighborhood Plan, Volume I, Objective HO-1.1. These policies require the City to enforce and strengthen zoning regulations that will preserve and enhance the appearance and character of the City’s neighborhoods; to use zoning regulations to restrict development that may negatively impact residential neighborhoods; and to use the City’s zoning ordinance to retain residential zoning where suitable. Miami Comprehensive Neighborhood Plan, Volume I, Policy HO-1.1.5, Policy HO-1.1.7, Policy HO-1.1.8.
Two of the items stricken relate to general procedures involved in plan amendments and rezoning: Objective 8-1 requires prompt review and action on petitions for land use plan amendments and rezoning in infill and redevelopment areas; Objective 3.2 requires creation of “formal procedures” for coordinating City planning and operating functions that are directly related to the City’s comprehensive plan with various federal, state, and local agencies and organizations. Miami Comprehensive Neighborhood Plan, Volume I, Objective 3.1, Objective 3.2.
Objective HO-2.1 states that the City will “[ajchieve a livable downtown with a variety of urban housing types for persons of all income levels.” Miami Comprehensive Neighborhood Plan, Volume I, Objective HO-2.1.
Objectives CI-1.1 and CI-1.2 relate to capital improvements and fiscal planning to provide the capital facilities required to maintain adopted LOS standards and are two of four objectives to assure that adequate resources are secured either from public or private sources “to maintain existing public infrastructure, that meet the need for public facilities resulting from future development and redevelopment. ...” Miami Comprehensive Neighborhood Plan, Volume I, Goal CI-1.
There is no “IC-1.2” as suggested by Petitioners’ exceptions. Objective IC-2.1 requires only the adoption of “a planning coordination mechanism” to ensure that consideration is given to the impacts of land development and transportation policies within Miami on areas outside the City and the impacts of development outside the City on the City. Miami Comprehensive Neighborhood Plan, Volume I, Objective IC-2.1.
Objective TR-1.5 states its objective to be to “support Miami-Dade County, which is the sole authorized operator of public transit in Miami-Dade County, in the provision of ... essential public transit services.” Miami Comprehensive Neighborhood Plan, Volume I, Objective TR-1.5. Objective TR-1.9 deals solely with the Port of Miami and Miami International Airport and states that the “City shall *771 seek to achieve consistency and coordination” between the two entities and the comprehensive plan. Miami Comprehensive Neighborhood Plan, Volume I, Objective TR-1.9.
Objectives SS-1.3 and PW-1.1 deal with concurrency and state that the City’s land use regulations — that is, zoning ordinances — will ensure that redevelopment will not occur unless adequate waste and potable water transportation exists to serve that development. Miami Comprehensive Neighborhood Plan, Volume I, Objective SS-1.3, Objective PW-1.1.
Objective PA-1.1 deals solely with the Port of Miami and states that the City “through its land development regulations,” that is, zoning regulations, will coordinate land use in those areas of the City located adjacent to the port with transportation related activities to ensure compatibility. Miami Comprehensive Neighborhood Plan, Volume I, Objective PA-1.1. The remaining items deal with the Port of Miami River. Objective PA-3.1 and Policy PA-3.1.3 require the City “through land development regulations,” that is zoning regulations, to “help protect the Port of Miami River from encroachment by non water-dependent or water-related land uses,” and to “mitigate potential adverse impacts arising from the Port of Miami River upon adjacent natural resources and land uses.” Miami Comprehensive Neighborhood Plan, Volume I, Objective PA-3.1, Policy PA-3.1.3. Objective PA-3.2 requires the City to coordinate surface transportation access to the Port of Miami River with the system shown on the traffic circulation map. Miami Comprehensive Neighborhood Plan, Volume I, Objective PA-3.2. Policy PA-3.3.1 requires the City “through its Intergovernmental Coordination Policies,” to support the functions of the Port of Miami River. Miami Comprehensive Neighborhood Plan, Volume I, Policy PA-3.3.1. There is no “PA-3.12” as suggested by Petitioners’ exceptions.
xx™ Petitioners stipulated in the administrative proceeding that this plan had never been adopted by the City and thus was not binding on it.

. The opinion which follows contains both footnotes, as indicated by Arabic numerals (1, etc.), and endnotes, as indicated by Roman numerals (i, etc.).

. This section, in pertinent part, provides:
(1)Amendments to comprehensive plans adopted pursuant to this part may be made not more than two times during any calendar year, except:
[[Image here]]
(c) Any local government plan amendments directly related to proposed small scale development activities.... A small scale development amendment may be adopted only under the following conditions:
1. The proposed amendment involves a use of 10 acres or fewer and:
a.The cumulative annual effect of the acreage for all small scale development amendments adopted by the local government shall not exceed:
(I) A maximum of 120 acres in a local government that contains areas specifically designated in the local comprehensive plan for urban infill, urban redevelopment, or downtown revitalization....
(II) A maximum of 80 acres in a local government that does not contain any of the designated areas set forth in sub-sub-sub-paragraph (I).
(III)A maximum of 120 acres in a county established pursuant to s. 9, Art. VIII of the State Constitution.
b. The proposed amendment does not involve the same property granted a change within the prior 12 months.
c. The proposed amendment does not involve the same owner's property within 200 feet of property granted a change within the prior 12 months.
d. The proposed amendment does not involve a text change to the goals, policies, and objectives of the local government’s comprehensive plan, but only proposes a land use change to the future land use map for a site-specific small scale development activity.
e. The property that is the subject of the proposed amendment is not located within an area of critical state concern, unless the project ... involves the construction of affordable housing units
[[Image here]]
f. If the proposed amendment involves a residential land use, the residential land use has a density of 10 units or less per acre, except that this limitation does not apply to small scale amendments ... that are designated in the local comprehensive plan for urban infill....
§ 163.3187(l)(c)l.a-f, Fla. Stat. (2004).

. The fairly debatable standard of review that is to be applied to the instant section 163.3187 small scale amendment is a "highly deferential” standard which mandates approval of a FLUM amendment where, for any reason, it can be said that such a legislative decision is open to dispute on grounds that make sense:
The fairly debatable standard of review is a highly deferential standard requiring approval of a planning action if reasonable persons could differ as to its propriety. In other words, an ordinance may be said to be fairly debatable when for any reason it is open to dispute or controversy on grounds that make sense or point to a logical deduction that in no way involves its constitutional validity.
Yusem, 690 So.2d at 1295 (citations and initial quotation marks removed); Coastal Dev., 788 So.2d at 205 n. 1 (applying the fairly debatable standard to section 163. 3187(1)(c) small scale FLUM amendments).

. See § 163.3187(3)(b) 1 — 2, Fla. Stat. (2004) ("If the administrative law judge recommends that the small scale development amendment be found in compliance, the administrative law judge shall submit the recommended order to the state land planning agency.... If the state land planning agency determines that the plan amendment is in compliance, the agency shall enter a final order.”).

. The proposed starting price for one of these units is $167,000.

. The parties relied on the August 2004 version of the Miami Comprehensive Neighborhood Plan, which is quoted extensively herein, with emphasis as in the original.

. Section 163.3180(2)(a) of the Florida Statutes, governing concurrency, expressly authorizes local governments to "consult with the applicable water supplier to determine whether adequate water supplies” will be available and has until issuance of "a certificate of occupancy or its functional equivalent” to do so.

. This testimony from this individual who is charged in the Plan with determining concurrency and consistency with the Plan, is competent substantial evidence. See City of Hialeah Gardens v. Miami-Dade Charter Found., Inc., 857 So.2d 202, 205 (Fla. 3d DCA 2003) (confirming that the testimony of professional staff, when based on "professional experiences and personal observations, as well as [information contained in an] application, site plan, and traffic study” constitutes competent substantial evidence); Palm Beach County v. Allen Morris Co., 547 So.2d 690, 694 (Fla. 4th DCA 1989) (confirming that professional staff reports analyzing a proposed use constituted competent substantial evidence); Metro. Dade County v. Fuller, 515 So.2d 1312, 1314 (Fla. 3d DCA 1987) (stating that staff recommendations constituted evidence); Dade County v. United Res., Inc., 374 So.2d 1046, 1050 (Fla. 3d DCA 1979) (confirming that the recommendation of professional staff "is probative”).

. See also Graham v. Estuary Props., Inc., 399 So.2d 1374, 1380 n. 10 (Fla.1981) ("The reviewing court cannot substitute its judgment for that of the agency on a finding of fact or the weight thereof.”); Lenard v. A.L.P.H.A. "A Beginning" Inc., 945 So.2d 618, 623 (Fla. 2d DCA 2006) (observing that "[w]hen reviewing the findings and conclusions of a government agency, this court is not permitted to substitute its judgment for that of the agency if competent, substantial evidence supports the agency’s factual findings and the agency correctly applied the applicable statutory criteria. § 120.68(7), (8), Fla. Stat. (2005)”); Young v. Dep't of Educ., Div. of Vocational Rehab., 943 So.2d 901, 902 (Fla. 1st DCA 2006) ("[I]t is the responsibility of the administrative law judge to evaluate and weigh the testimony and other evidence submitted at the hearing to resolve factual conflicts, and to arrive at findings of fact. It is not the role of the appellate court to reweigh the evidence anew.”); Mullins v. Dep't of Law Enforcement, 942 So.2d 998, 1000 (Fla. 5th DCA 2006) ("This Courts review of the Commission’s final order accepting and adopting the ALJ’s findings of fact and conclusions of law is governed by section 120.68, Florida Statutes (2005). See Legal Envtl. Assistance Found., Inc. v. Clark, 668 So.2d 982, 986 (Fla.1996). A reviewing court may set aside agency action only when it finds that the action is dependent on findings of fact that are not supported by substantial competent evidence in the record, material errors in procedure, incorrect interpretations of law, or an abuse of discretion. § 120.68(7), Fla. Stat. (2005). When factual findings are reviewed, the court must not substitute its judgment for that of the agency in assessing the weight of the evidence or resolving disputed issues of fact. See § 120.68(10), Fla. Stat. (2005); Ma- *763 lave v. Dep’t of Health, Bd. of Med., 881 So.2d 682, 684 (Fla. 5th DCA 2004); Gross v. Dep’t of Health, 819 So.2d 997, 1002 (Fla. 5th DCA 2002).”); Knight v. Winn, 910 So.2d 310, 312 (Fla. 4th DCA 2005) ("[T]his court may not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact.’ ” (quoting § 120.68(7)(b), Fla. Stat.)); Quevedo v. S. Fla. Water Mgmt. Dist., 762 So.2d 982, 988 (Fla.4th DCA 2000) ("This court is 'prohibited from substituting [its] judgment for that of the agency in assessing the weight of the evidence resolving disputed factual issues.' ” (quoting Perdue v. TJ Palm Assocs., Ltd., 755 So.2d 660, 666 (Fla. 4th DCA 1999))); Schrimsher v. Sch. Bd. of Palm Beach County, 694 So.2d 856, 861 (Fla. 4th DCA 1997) ("[W]e are prohibited from substituting our judgment for that of the agency in assessing the weight of the evidence or resolving disputed factual issues. § 120.68(10), Fla. Stat. (Supp.1996). The School Board's action may be set aside only after a determination that the agency's findings are not supported by competent substantial evidence in the record. § 120.68(10), Fla. Stat. (Supp.1996).”); Gershanik v. Dep’t of Prof'l Regulation, Bd. of Med. Exam’rs, 458 So.2d 302, 304 (Fla. 3d DCA 1984) ("[T]his court may not substitute its judgment for that of the agency as to disputed findings of fact or as to weight of the evidence.”); Pasco County Sch. Bd. v. Fla. Pub. Employees Relations Comm’n, 353 So.2d 108, 116 (Fla. 1st DCA 1977) ("We may only set aside such action or remand the case to the agency if we find the agency's order depends upon any finding of fact which is not supported by competent substantial evidence in the record. It is not appropriate for us to resolve conflicts in the testimony adduced before an administrative tribunal.... [N]or is it our province to displace an agency's choice between two conflicting views even if we would be justified in deciding the issue differently were it before us in the first instance.”); Bd. of Regents v. Budjan, 242 So.2d 163, 165 (Fla. 1st DCA 1970) ("It is well settled that the Commission is a fact-finding body and that this Court will not substitute its judgment for that of the trier of fact.”); Pauline v. Lee, 147 So.2d 359, 363 (Fla. 2d DCA 1962) (A reviewing court should not "substitute its judgment for that of the administrative fact finder who heard the testimony and was in a position to evaluate the credibility of witnesses.”).